**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Claudia BORECKY; and Mariateresa THIERY, <br><br> *Plaintiffs*, <br><br> v. <br><br> COUNTY OF NASSAU; Bruce BLAKEMAN in his official capacity as County Executive of the County of Nassau; and Patrick J. RYDER in his official capacity as Commissioner of the Nassau County Police Department, <br><br> *Defendants*. | Case No. 2:26-cv-2049 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A**
**PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ................................................................................................................... 12

I.    Plaintiffs Are Likely to Succeed on the Merits. ................................................... 13

    a.    The Nassau Buffer Law Violates the First Amendment. .................................. 13

        i.    The Nassau Buffer Law is Not Narrowly Tailored. ..................................... 14

        ii.   The Nassau Buffer Law Fails to Provide Ample Alternative Channels for
             Communication. ...................................................................................... 17

    b.    The Nassau Buffer Law Is Void for Vagueness and Violates Due Process. .................... 20

II.   Absent Preliminary Relief, Plaintiffs Will Continue to Experience Irreparable Harm. ....... 23

III.  The Balance of Equities and the Public Interest Strongly Favor Preliminary Relief. .......... 24

IV.   The Court Should Enjoin Enforcement Against All Speakers. ............................................ 25

CONCLUSION ................................................................................................................ 27

## TABLE OF AUTHORITIES

**Cases** ..................................................................................................................Page(s)

*Ayres v. City of Chicago*,
    125 F.3d 1010 (7th Cir. 1997) ...................................................................18, 19

*Beal v. Stern*,
    184 F.3d 117 (2d Cir. 1999)...................................................................................17

*Chicago v. Morales*,
    527 U.S. 41 (1999)...........................................................................................20, 22

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994)....................................................................................................20

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984)..................................................................................................14

*Cohen v. California*,
    403 U.S. 15 (1971)....................................................................................................13

*Connick v. Myers*,
    461 U.S. 138 (1983)..................................................................................................22

*Cox v. State of La.*,
    379 U.S. 536 (1965)..................................................................................................21

*Cox v. State of La.*,
    379 U.S. 559 (1965).............................................................................................21, 22

*Deide v. Day*,
    676 F. Supp. 3d 196 (S.D.N.Y. 2023)....................................................................24

*Doe v. Burlew*,
    165 F.4th 525 (6th Cir. 2026) .................................................................................25

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..................................................................................................21

*Hill v. Colorado*,
    530 U.S. 703 (2000).......................................................................................14, 15, 16

*Hill v. Thomas,*
    973 P.2d 1246 (Colo.1999).....................................................................................16

*Kinney-Coastal Oil Co. v. Kieffer*,
    277 U.S. 488 (1928).................................................................................................25

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994)...............................................................................................15

*Make the Rd. New York v. Cuccinelli*,
    419 F. Supp. 3d 647 (S.D.N.Y. 2019),
    *aff'd as modified sub nom. New York v. United States Dep't of Homeland Sec.*, 969 F.3d
    42 (2d Cir. 2020)....................................................................................................24

*McCullen v. Coakley*,
    573 U.S. 464 (2014)...................................................................................14, 15, 18, 20

*McSweeney v. Cohen*,
    776 F. Supp. 3d 200 (S.D.N.Y. 2025).......................................................................26

*Million Youth Mar., Inc. v. Safir*,
    18 F. Supp. 2d 334 (S.D.N.Y. 1998).....................................................................18, 19

*Nat'l Ass'n for Advancement of Colored People v. Button*,
    371 U.S. 415 (1963)................................................................................................2

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013)................................................................................23, 25

*P.G. v. Jefferson Cty.*,
    No. 21-CV-388, 2021 WL 4059409 (N.D.N.Y. Sept. 7, 2021).......................................25

*People v. Ferber*,
    57 N.Y.2d 256 (1982) ............................................................................................13

*People v. Isaacson*,
    44 N.Y.2d 511 (1978) ............................................................................................20

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
    460 U.S. 37 (1983)................................................................................................18

*Police Dept. of Chicago v. Mosley*,
    408 U.S. 92 (1972)................................................................................................13

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015)..............................................................................................13

*Reps. Comm. for Freedom of the Press v. Rokita*,
    147 F.4th 720 (7th Cir. 2025) ...........................................................................23, 25

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)..............................................................................................25

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020)................................................................................................23

*Schenck v. Pro-Choice Network of W. New York*,
519 U.S. 357 (1997)..........................................................................................14, 15

*Smith v. Goguen*,
415 U.S. 566 (1974)................................................................................................22

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*,
120 F.4th 59 (2d Cir. 2024) ....................................................................................23

*Statharos v. New York City Taxi & Limousine Comm'n*,
198 F.3d 317 (2d Cir. 1999)....................................................................................23

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)..........................................................................................25, 27

*V.W. ex rel. Williams v. Conway*,
236 F. Supp. 3d 554 (N.D.N.Y. 2017).....................................................................24

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982)................................................................................................21

*Volokh v. James*,
148 F.4th 71 (2d Cir. 2025) ..............................................................................12, 13

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)..........................................................................................14, 17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................................................................................................24

**Statutes, Rules and Regulations**

18 U.S.C. § 248(a)(2)...............................................................................................4, 17

Local Law No. 6-2025 § 2 ............................................................................................16

Local Law No. 6-2025 § 3 ..............................................................................................6

Local Law No. 6-2025 § 4 ........................................................................6, 16, 19, 21

N.Y. Const. art. I, § 6....................................................................................................21

N.Y. Const., art. I, § 8...................................................................................................13

N.Y. Penal Law § 240.21..............................................................................................17

iv

N.Y. Penal Law § 240.25–30 ................................................................................................17

N.Y. Penal Law § 240.70–71 ...........................................................................................4, 17

**INTRODUCTION**

As the Supreme Court has repeatedly recognized, public streets and sidewalks are the quintessential public fora for speech and expressive conduct. In contravention of this longstanding tradition, Nassau County has enacted a sweeping restriction on numerous forms of speech, assembly, and expressive activity that would impact public streets and sidewalks outside of the nearly 1,000 places of worship in the County. Declaration of Elizabeth Gyori ("Gyori Decl.") Ex. 1 (hereinafter "Local Law No. 6-2025 or "Nassau Buffer Law"). The law stifles speech by criminalizing, for large periods of time, expressive activity within 35 feet of places of worship and speech knowingly made to another person at a distance of 10 feet or less, without their express consent, within 100 feet of places of worship. This widespread prohibition on expressive activity is entirely unjustified and not tailored to any governmental interest. While protections for individuals to safely practice religion are of paramount importance and a significant government interest, the legislative record does not contain a history of *any*—let alone repeated—unlawful conduct taking place outside of any place of worship in Nassau County. Defendants have made no effort to demonstrate why the state and federal laws that already protect worshipper safety are or have ever been insufficient in Nassau County.

Since its passage, this law has silenced individuals—even worshippers themselves—from engaging in peaceful speech and expressive conduct outside of Nassau's many places of religious worship on matters of great personal and public concern. Plaintiffs Claudia Borecky and Mariateresa Thiery, two Nassau residents and Catholics, are now afraid of continuing their regular organizing and/or attendance at protests, rallies, marches, vigils, and other actions due to the Nassau Buffer Law. For example, both Ms. Borecky and Ms. Thiery seek to distribute leaflets directly outside of Nassau Catholic churches before or after Mass to reach churchgoers to discuss

their faith and to encourage their fellow Catholics to protect and welcome immigrants in the Christian tradition. But, fearing arrest, Ms. Borecky cancelled such a leafleting action—one in which Ms. Thiery planned to participate—after the Nassau Buffer Law was passed by the Nassau County Legislature, and is too afraid to plan another leafleting action while the law is in effect. The law leaves Ms. Borecky and Ms. Thiery with no other adequate avenue to directly and effectively communicate their message.

By broadly criminalizing protected speech, peaceful assembly and expression, including on public sidewalks and streets outside of places of worship, the Nassau Buffer Law violates the First Amendment of the United States Constitution and Article 1, Sections 8 and 9 of the New York Constitution, both on its face and as applied to Plaintiffs. Given the lack of any record of obstruction, interference, or other unlawful conduct outside of places of worship in Nassau County, the government's undoubtedly important interests in religious safety cannot outweigh such broad speech restrictions. Where free expression is concerned, "[b]road prophylactic rules … are suspect" and "[p]recision of regulation" is the touchstone. *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 438 (1963). The Nassau Buffer Law is also vague because it confers unbounded discretion on police to enforce the law in an arbitrary and discriminatory manner, in violation of the Due Process Clause of the Fourteenth Amendment and Article 1, Section 6 of the New York State Constitution.

The Nassau Buffer Law strikes at the heart of New Yorkers' right to express their views in public and must be preliminarily enjoined as to Plaintiffs and others who seek to peacefully speak and assemble outside of places of worship in Nassau County.

## BACKGROUND

**The Legislative Record**

The legislative record underlying the Nassau Buffer Law is scant—comprising a mere

2

nineteen minutes of discussion across two legislative meetings. *See* Gyori Decl. ¶¶ 5, 9. But what is clear from the record is that the law was introduced and passed in response to events occurring *outside* Nassau County. *Id*. ¶¶ 6–8, 10; Compl. ¶ 26. Specifically, the legislative record shows that the law was first introduced by Legislator Mazi Melesa Pilip in the County Legislature's Committee on Public Safety on December 8, 2025, in response to a protest outside of Park East Synagogue in Manhattan, New York on November 19, 2025. Gyori Decl. ¶ 5–8. The legislature passed the Nassau Buffer Law during a subsequent meeting of the full Nassau County Legislature on December 17, 2025, in response to both the New York City protest and the mass shooting during a Hanukkah celebration on Bondi Beach in Sydney, Australia on December 14, 2025. *Id*. ¶¶ 9–10.

During the December 17 legislative hearing, legislators also emphasized that Nassau County is "the safest county in the country." *Id*. ¶ 11. Legislators noted that the Nassau Buffer Law was meant to be "proactive," rather than responding to any particular issue in Nassau. *Id*. Not one legislator cited any incidents of violence or unlawful activity targeted at worshippers in Nassau County in either legislative hearing. *Id*.

The only public testimony concerning the law was from a member of the public expressing concern that the law would infringe on constitutional rights. *Id*. ¶ 13. At the December 17 hearing, Legislator Arnold W. Drucker, who identified himself as a trained attorney on the record, tacitly acknowledged that the Nassau Buffer Law violates the Constitution, but that he supports it nonetheless because he had "evolved" from a "strict interpreter of our constitution" and now "feel[s] [the law] is necessary" to help him feel safe. *Id*. ¶ 12.

Despite the lack of any evidence of unlawful activity, such as interference, obstruction, or threats of force, outside of places of worship in Nassau, and even after acknowledging concerns

3

about the law's constitutionality, on December 17, 2025, the Nassau County Legislature voted unanimously to pass the Nassau Buffer Law. *Id*. ¶ 15; Gyori Decl. Ex. 1. Lawmakers made no findings to support the need for the 35-foot Fixed Buffer Provision or the 100-foot Floating Bubble Provision, especially in light of existing state and federal laws that already prohibit obstruction or interference with anyone entering or exiting a place of worship. *See* Gyori Decl. ¶¶ 11, 14; *see, e.g.*, N.Y. Penal Law §§ 240.70–71; 18 U.S.C. § 248(a)(2).

**The Nassau Buffer Law**

On January 12, 2026, Nassau County Executive Bruce Blakeman signed the bill into law, as Local Law No. 6-2025 ("Nassau Buffer Law"), and it became immediately effective. Gyori Decl. Ex. 1.

The Nassau Buffer Law makes it unlawful for "any person to demonstrate, picket, protest, distribute literature, display signs, engage in oral advocacy, or other forms of expressive or symbolic conduct, whether conducted individually or in groups, within thirty-five (35) feet of the Entrance Area or Driveway of a Place of Religious Worship." *Id.* § 4(b). This "Fixed Buffer Provision" prohibiting protected speech and expressive conduct applies one hour before "the scheduled start of any religious service, community meeting, ceremony, or other congregational, educational or organizational meeting or event," during all aforementioned events, and for one hour after the conclusion of such events. *Id*.

The Law additionally prohibits "any person," when within 100 feet of an entrance to any "Place of Religious Worship," from "knowingly approach[ing] within ten (10) feet of an individual, without such individual's expressed consent, for the purpose of demonstrating, picketing, protesting, distributing literature, displaying signs, engaging in oral advocacy, or other forms of expressive or symbolic conduct, whether conducted individually or in groups." *Id.* § 4(a).

4

This "Floating Bubble Provision" prohibiting protected speech and expressive conduct similarly applies one hour before "the scheduled start of any religious service, community meeting, ceremony, or other congregational, educational or organizational meeting or event," during all aforementioned events, and for one hour after the conclusion of such events. *Id*.

The Law defines a "Place of Religious Worship" broadly as "any church, synagogue, mosque, temple, or other building or location regularly used primarily for religious worship, religious education, or religious services." *Id*. § 3(1). "Entrance Area" is defined as "any doorway, threshold, entryway, gate ramp, or other point of ingress or egress to a Place of Religious Worship." *Id*. § 3(2). A "Driveway" is defined as "an entry from a public street to any parking lot in which the Place of Religious Worship has an ownership, easement or leasehold interest or other property right." *Id*. § 3(3).

Criminal liability for violating the Nassau Buffer Law attaches after a person "receiv[es] a verbal, written, or other communicative or expressive instruction, warning or order from" a police officer. *Id*. § 4. The statute grants law enforcement wide discretion in the type of "instruction, warning or order" to give, as well as when and how such communication should be given. Violation of the Law is a misdemeanor punishable by a fine up to $250, imprisonment up to one year, or both. *Id*. § 5.

**The Nassau Buffer Law Limits Speech on Public Streets and Sidewalks Adjacent to Places of Worship**

With approximately 980 places of religious worship in Nassau County, the Nassau Buffer Law implicates speech and expressive conduct on hundreds of streets and sidewalks in Nassau County. Declaration of Melissa Avilez Lopez ("Avilez Lopez Decl.") ¶ 5; Avilez Lopez Decl. Ex. 1. This is because places of worship in Nassau County often have at least one of two features that cause the law to restrict speech on public fora: (1) a "Driveway" that connects a public street to a

5

place of worship and is often next to a sidewalk, and from which the 35-foot Fixed Buffer Provision applies, *see* Local Law No. 6-2025 §§ 3(3), 4(b); and/or (2) an "Entrance Area" that directly opens onto a public sidewalk and road, and from which the 35-foot Fixed Buffer and 100-foot Floating Bubble Provisions apply, *see id*. §§ 3(2), 4(a)–(b). *See also* Avilez Lopez Decl. Exs. 52–71; Declaration of Claudia Borecky ("Borecky Decl.") Exs. 1–4; Declaration of Mariateresa Thiery ("Thiery Decl.") Exs. 1–2; Declaration of Susan Gottehrer ("Gottehrer Decl.") Exs. 1–5. These two features typically mean that expressive activities are restricted in public fora outside of places of worship, and especially burdened where individuals are most likely to engage in expressive activity targeted at attendees of an event.

The Nassau Buffer Law's sweeping ban on speech in traditional public fora is not only vast geographically but also far-reaching in terms of time in effect. In any given week, places of worship across Nassau County host a plethora of religious services, community meetings, ceremonies, and other events that would trigger the application of the Fixed Buffer and Floating Bubble Provisions. *See* Local Law No. 6-2025 § 4(a); Avilez Lopez Decl. ¶¶ 29–35; Avilez Lopez Decl. Exs. 49–51. Some places of worship also offer classes, schools and clubs while others permit their spaces to be booked for external events, such as family and athletic events, and each service, meeting, or event bars speech for hours at a time. Avilez Lopez Decl. ¶¶ 29–35; Avilez Lopez Decl. Exs. 49–51. When multiple services, meetings, or events are held on one day, the law's ban on speech could apply for the entire day. *See* Avilez Lopez Decl. Exs. 49–51. Across one week, the law could leave only very narrow hours for individuals to engage in speech in traditional public fora outside places of worship. *See id.*

**The Nassau Buffer Law has Chilled Plaintiffs' Speech**

Plaintiffs Claudia Borecky and Mariateresa Thiery are long-time residents of Nassau County who have regularly organized and/or attended protests and demonstrations, including leafleting, displaying signs, and participating in marches throughout Nassau. Borecky Decl. ¶¶ 6–7; Thiery Decl. ¶¶ 4–6, 8–9. Both are Catholic, and their faith is a central part of their upbringing, education, and personal values. Borecky Decl. ¶ 8; Thiery Decl. ¶¶ 4–6. Both strongly believe that supporting and welcoming immigrants is consistent with Christian teachings and have participated in actions and activities in support of immigrants' rights due to their faith. Borecky Decl. ¶¶ 8, 14–16; Thiery Decl. ¶¶ 6–8.

Bishops' Statement Protest

On November 16, 2025, Ms. Borecky learned about the New York State Catholic Bishops' statement titled, "For You Too Were Once Aliens..." ("Bishops' Statement" or "Statement"), that supports immigrants and opposes indiscriminate mass deportation. Borecky Decl. ¶ 17; Gyori Decl. Ex. 3. The Bishops' Statement highlights Mother Cabrini, the patron saint of all immigrants, and invites Catholics to sign a pledge in her honor ("Cabrini Pledge"). Borecky Decl. ¶ 17; Gyori Decl. Ex. 3.

Typically, statements like these are printed as an insert to weekly parish bulletins and read aloud during the first Mass after they are issued, but Ms. Borecky and Ms. Thiery believed the Bishops' Statement was not read out loud during Mass at several churches in Nassau County because of the political affiliations of church priests and members. Borecky ¶¶ 18–21; Thiery Decl. ¶ 17. Wanting to spread awareness about the Bishops' Statement and the New York State Catholic Bishops' pro-immigration position directly to churchgoers in hopes of convincing them to sign the Cabrini Pledge, to take a stand in support of their immigrant neighbors, and to persuade their

7

pastors to read the Bishops' Statement, Ms. Borecky planned a leafleting action to distribute the Statement outside of churches in Nassau, and Ms. Thiery planned to participate. Borecky Decl. ¶¶ 22–23; Thiery Decl. ¶¶ 18–21.

Ms. Borecky organized a group of volunteers—including Ms. Thiery—to distribute the Bishops' Statement on fliers in pairs before or after Mass on December 21, 2025, on the sidewalks directly outside of the main entrances and driveways of nine churches in Nassau County: Curé of Ars in Merrick, St. Barnabas the Apostle in Bellmore, St. Frances de Chantal in Wantagh, Maria Regina in Seaford, St. Raphael in East Meadow, Sacred Heart in North Merrick, St. William the Abbot in Seaford, St. Rose of Lima in Massapequa, and St. Francis in East Meadow. Borecky Decl. ¶¶ 23–24, 29. Of those, Ms. Thiery planned to leaflet outside of Sacred Heart and Curé of Ars. Thiery Decl. ¶ 20.

The plan was to stand on the public sidewalks adjacent to the nine churches' entryways and driveways; approach parishioners on foot or in cars; smile; encourage them to take the flyer concerning the Bishops' Statement and the Cabrini Pledge as they were traveling to and from the church; and engage willing churchgoers in conversations about what the Christian faith teaches with respect to supporting immigrant communities, including directing them to scan the QR code on the flyer if they were interested in helping immigrants. Borecky Decl. ¶ 30; Thiery Decl. ¶ 21.

To be effective and respect Mass, the action was intended to be peaceful and non-disruptive. Borecky Decl. ¶ 31; Thiery Decl. ¶ 21. A larger group of volunteers was needed to be able to go to each of the churches in a short time frame, and it was necessary to leaflet in pairs for safety and so volunteers had the support of another person. Borecky Decl. ¶ 32. Additionally, distributing the leaflets in pairs helped cover more ground because two people could stand at different exits to reach more people coming and going from church. *Id.* For Ms. Thiery, she was

looking forward to participating in this action with other volunteers because she felt it was important to show that many Catholics in the community cared about the Bishops' Statement and immigrants' rights. Thiery Decl. ¶ 22.

On December 17, 2025, the Nassau County Legislature passed the Nassau Buffer Law. Gyori Decl. ¶ 15; Gyori Decl. Ex. 1. After its passage, Ms. Borecky and Ms. Thiery both believed that the planned leafleting action was prohibited under the law, as they thought they would be conducting their leafleting action on public sidewalks within at least 100 feet, if not 35 feet, of the nine churches' entrances and driveways. Borecky Decl. ¶ 35; Thiery Decl. ¶ 23. They were not wrong. All nine churches have at least one entrance and one driveway, but typically more than one of each, from where the Fixed Buffer and Floating Bubble emanate. Avilez Lopez Decl. Exs. 2–10, 52–60; Borecky Decl. Exs. 1–3; Thiery Decl. Ex. 1. The public sidewalks near those locations all mostly fall within at least 100 feet, if not 35 feet, of the entrance or driveway. *See id.*

Believing that the law would take effect immediately and that she would face arrest and jail time, Ms. Borecky cancelled the Bishops' Statement leafleting action for herself and her volunteers because she did not want anyone to be arrested. Borecky Decl. ¶¶ 35–36. Because they both fear arrest, Ms. Borecky and Ms. Thiery feel they cannot share the Bishops' Statement or engage churchgoers outside churches in conversations about their shared faith, the Statement, and immigrants' rights. Borecky Decl. ¶ 40–41; Thiery Decl. ¶¶ 24–25. If the law were struck down, both Ms. Borecky and Ms. Thiery would participate in the Bishops' Statement leafleting action. Borecky Decl. ¶ 41–42; Thiery Decl. ¶ 25.

Ms. Borecky explored other means of getting the Bishops' Statement to church members and pastors, but those attempts were unsuccessful and would not have been as effective as leafleting and speaking to churchgoers outside of the churches. Borecky Decl. ¶¶ 37–39. Because

of the Nassau Buffer Law, Ms. Borecky and Ms. Thiery do not have an effective way to spread their messages about their faith and immigrants' rights to the individuals and communities for whom it has the most significance and impact. *Id.* ¶ 40; Thiery Decl. ¶ 24.

Whistle Packets Action

Apart from the Bishops' Statement action, Ms. Thiery also sought to hand out packets containing whistles and leaflets to churchgoers and pastors entering and leaving storefront churches in Roosevelt and Freeport, New York, but has not done so because of the Nassau Buffer Law. Thiery Decl. ¶¶ 28–30. The packets contain leaflets with know-your-rights information about interacting with ICE and whistles to alert community members to ICE presence and to form a crowd, bear witness, and express themselves. *Id.* ¶ 28. She did not follow through with distributing the packets because she was afraid if she went to these storefront churches, she would be arrested and jailed under the Nassau Buffer Law. *Id.* ¶ 30. This is because storefront churches typically have entrances, and sometimes driveways, that open directly onto public sidewalks, meaning Ms. Thiery and others would have to engage in leafleting and oral advocacy within 35–100 feet of a church entrance for the action. *See, e.g.*, Avilez Lopez Decl. Exs. 61–66 (measurements of distances from entrances and/or driveways of storefront churches to sidewalks); Gottehrer Decl. Exs. 1–5 (photos of storefront churches). While Ms. Thiery considered alternative ways of engaging in this action, such as handing the whistles and leaflets directly to pastors, she could not determine how to do so while complying with the law and abandoned the action altogether. Thiery Decl. ¶ 31.

Future Speech

Both Ms. Borecky and Ms. Thiery are concerned about how the Nassau Buffer Law will affect their ability to attend other protests, rallies and demonstrations in the future due to the risk

10

of arrest. Borecky Decl. ¶ 43; Thiery Decl. ¶ 34. Other people have also confided in Ms. Borecky that they are similarly afraid to attend protests, rallies and demonstrations due to the law, and will modify their behavior at these actions in the future. Borecky Decl. ¶ 44. Both Ms. Borecky and Ms. Thiery are worried that the law will reduce the power and impact of their speech on public consciousness, opinion, and on their abilities to influence the positions taken by elected officials and the Catholic Church. Borecky Decl. ¶ 44; Thiery Decl. ¶ 36.

If the Nassau Buffer law is struck down or repealed, both Ms. Borecky and Ms. Thiery will carry out the plan to distribute the Bishops' Statement outside of churches in Nassau County before and after Mass, and they will also participate in other demonstrations and marches that take place outside of or go past places of worship. Borecky Decl. ¶¶ 41, 45; Thiery Decl. ¶¶ 25, 39. Ms. Thiery will also participate in handing out know-your-rights leaflets outside storefront churches. Thiery Decl. ¶ 33. Until then, both will not participate in any leafleting action; not intentionally attend a protest outside of a place of worship; and be cautious when attending marches past a place of worship due to fear of arrest, jail time, and/or fines. Borecky Decl. ¶ 45; Thiery Decl. ¶ 37.

**The Nassau Buffer Law Threatens Speech in Entire Towns in Nassau County**

The Nassau Buffer Law not only restricts speech akin to that which Ms. Borecky and Ms. Thiery wish to engage. In more populous towns, the law threatens to make entire streets impassable for marches and other forms of moving speech. For example, in Merrick, New York, nine places of worship are close in proximity to the Long Island Railroad Station in town, where Plaintiffs gather monthly for Stop the Chaos protests. Avilez Lopez Decl. Ex. 11. Forming a loose circle around the train station, the density of places of worship—often with several driveways and entrance areas that open up to public sidewalks and roads—makes it difficult for individuals to meet at the train station and march to another location or to engage in moving conversations with

11

others while canvassing or leafleting. *Id*.; *see also, e.g.*, Avilez Lopez Decl. Exs. 60, 67; Borecky Decl. Exs. 2, 4.

Similarly, in Hempstead, New York, thirty-four places of worship are located closely together in one area of town, including eight places of worship that line six blocks of North Franklin Street. Avilez Lopez Decl. Ex. 12. Many of the places of worship in Hempstead have entrances and driveways that open directly to public sidewalks and streets and would be clearly impacted by both the 35-foot Fixed Buffer and the 100-foot Bubble. *See* Avilez Lopez Decl. Exs. 61–66; Gottehrer Decl. Exs. 1–5. The density of places of worship in Hempstead makes it very difficult, if not impossible, to march down many streets during specific times of day or of the week or to conduct canvassing and leafleting of passersby while moving and speaking with others.

In Freeport, New York, ten places of worship dot streets north of Sunrise Highway, making planning any march route from the west side of town to Northeast Park difficult, if not largely impossible, during certain days and times. Avilez Lopez Decl. Ex. 13. Similarly, south of Sunrise Highway, six places of worship make moving protests on Pine Street, Church Street, and West Merrick Road burdensome. Canvassing and leafleting of passersby are also significantly impeded by the Nassau Buffer Law in Freeport, New York. *Id*.

## ARGUMENT

"When a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Volokh v. James*, 148 F.4th 71, 82 (2d Cir. 2025) (citation omitted). "In a First Amendment challenge to a state or federal statute, 'the likelihood of success on the merits is the dominant, if not the dispositive, factor'" because "irreparable harm and the

12

impact on the public interest track closely with the constitutionality of the challenged statute." *Id*. (citation omitted).

### I.   Plaintiffs Are Likely to Succeed on the Merits.

#### a.   *The Nassau Buffer Law Violates the First Amendment.*

Plaintiffs are likely to succeed on their claim that the Nassau Buffer Law violates the First Amendment. Since "[t]he protection afforded by the [New York] State constitutional right of free expression (N.Y. Const., art. I, § 8) is as broad as that provided by the First Amendment," Plaintiffs are also likely to succeed on their claim that the law violates the New York State Constitution's free expression protections. *People v. Ferber*, 57 N.Y.2d 256, 259 (1982).

The Supreme Court has repeatedly held that in traditional public fora, like public sidewalks and streets, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Courts are correctly skeptical of governmental restrictions on speech in public fora where anyone who does not want to hear the speaker's message is free to walk away. *See Cohen v. California*, 403 U.S. 15, 21 (1971) ("[W]e are often 'captives' outside the sanctuary of the home and subject to objectionable speech." (citation omitted)). Even so, the Supreme Court has recognized that certain significant or compelling interests may justify some restrictions on speech, including on public sidewalks and streets, so long as the restrictions are not aimed at the suppression of any particular viewpoint. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Further, all "[e]xpression . . . is subject to reasonable time, place, or manner restrictions" so long as the restrictions are "justified without reference to the content of

the regulated speech," "are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Even under the intermediate scrutiny accorded content-neutral laws, the Nassau Buffer Law[1] fails because it is not "narrowly tailored" and does not "leave open ample alternative channels for communication." *Clark*, 468 U.S. at 293.

      i.   The Nassau Buffer Law is Not Narrowly Tailored.

The "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). Yet the Nassau Buffer Law does exactly that. The Supreme Court has made clear that in order for laws like the Nassau Buffer Law to be narrowly tailored to serve a significant governmental interest, there must be: (1) a strong record of repeated unlawful activity, such as violent and obstructive conduct, that threatens access to a particular site or people entering and exiting the location; and (2) a showing, including based on past enforcement, that existing or other laws have not and/or cannot sufficiently address this unlawful conduct. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 470–71, 490–96 (2014); *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 362–66, 377–83 (1997); *Hill v. Colorado*, 530 U.S. 703, 714–15, 726–30 (2000). For example, in *McCullen*, 573 U.S. 464, the Court struck down a law providing for a fixed 35-foot buffer zone around reproductive healthcare facilities, even though the legislative record was filled with evidence—including videos—of repeated violence, obstruction of entrances, and

---

[1] The Nassau Buffer Law restricts "engaging in oral advocacy, or other forms of expressive or symbolic conduct, whether conducted individually or in groups" but does not prohibit all forms of speech, such as everyday social conversations. Determining whether the speech is prohibited, therefore, turns on an examination of the content of the speech. *But see Hill v. Colorado*, 530 U.S. 703, 719–25 (2000). Plaintiffs recognize that this Court is bound by the Supreme Court's decision in *Hill*, however, and as explained *infra*, the Nassau Buffer Law is unconstitutional applying that analysis.

14

harassment of patients and staff that the police were unable to stop and that was in violation of an earlier-passed law attempting to address these issues arising from anti-abortion protests. *Id*. at 470–71, 496. Despite this record, the Court held the buffer zone law there was not narrowly tailored, because other laws, such as existing criminal laws and prohibitions on obstructing or impeding access to healthcare facilities, could more narrowly address the issues at hand without burdening all speech. *Id*. at 490–93. Further, the Court held that "creating 35–foot buffer zones at every clinic across the [state] is hardly a narrowly tailored solution" when the documented violence and access issues only occur "once a week in one city at one clinic." *Id*. at 493.

Similarly, in *Schenck*, 519 U.S. 357, the Court struck down an injunction mandating 15-foot "floating buffer zones around people entering and leaving [reproductive healthcare] clinics because they burden more speech than is necessary." *Id*. at 377.[2] There, the record showed repeated "physically abusive conduct, harassment of the police that hampered law enforcement, and the tendency of even peaceful conversations to devolve into aggressive and sometimes violent conduct." *Id*. Nonetheless, the Court held that the floating nature of the buffer zone burdened too much one-on-one expressive activity, such as "[l]eafletting and commenting on matters of public concern," "classic forms of speech that lie at the heart of the First Amendment." *Id*. Conversely, in *Hill*, 530 U.S. 703, the Court upheld an 8-foot floating buffer zone that "allows the speaker to

---

[2] Notably, there are "First Amendment virtues" to "targeted injunctions," in contrast to "broad, prophylactic measures." *McCullen*, 573 U.S. at 492. "[A]n injunction 'regulates the activities, and perhaps the speech, of a group,' but only 'because of the group's past *actions* in the context of a specific dispute between real parties[,]'" and "courts can tailor a[n] [injunctive] remedy to ensure that it restricts no more speech than necessary." *Id*. (quoting and citing *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 762 (1994)) (other citation omitted). While "[i]njunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances," *Madsen*, 512 U.S. at 764, ordinances proscribing speech in particular zones "categorically excludes non-exempt individuals from the buffer zones, unnecessarily sweeping in innocent individuals and their speech." *McCullen*, 573 U.S. at 492–93.

communicate at a 'normal conversational distance'" with passersby and does not wholly prevent leafleting. *Id*. at 726–27 (citation omitted). There, the legislative history, including testimony from multiple witnesses, showed that "demonstrations in front of abortion clinics impeded access to those clinics and were often confrontational." *Id*. at 709; *see also Hill v. Thomas,* 973 P.2d 1246, 1250–51 (Colo. 1999).

Where, as here, there is neither any legislative record of repeated unlawful activity outside places of worship in Nassau County, nor a showing that existing laws cannot address public safety threats, the Nassau Buffer Law's dramatic burden on speech at the core of First Amendment protections—including on leafleting and one-on-one conversations—is far from narrowly tailored. The law's Fixed Buffer Provision is a broad prohibition on speech within thirty-five feet of places of worship in Nassau County while its Floating Bubble Provision regulates speech within thirty-five feet to 100 feet of places of worship, generally prohibiting a wide range of one-on-one expressive activities, such as leafleting, oral advocacy, and displaying signs, without express consent by the speech's recipient. Local Law 6-2025 § 4. While the Law acknowledges that religious freedom encompasses individuals' ability "to safely travel to and from religious institutions without physical obstruction, interference, intimidation, or risk of injury," *id*. § 2, the legislative record shows no demonstrated record of *any*, let alone repeated, public safety threats or unlawful activity outside of the County's places of worship, including during protests or other activities protected by the First Amendment. *See supra* at 2–4. Instead, the sparse record shows that legislators were prompted to pass the law in response to a protest outside of a synagogue in a different county and to the Bondi Beach mass shooting in Australia. *See supra* at 3. Legislators repeatedly characterized Nassau County as "the safest county in the country" and noted that the law was "proactive." *See id*.

16

Further, laws already impose criminal and civil sanctions for certain violent, threatening, obstructive, and destructive conduct, including conduct intended to injure, intimidate, or interfere with worshippers seeking access to religious services. *See, e.g.*, N.Y. Penal Law §§ 240.25–30 (prohibiting criminal harassment); *id*. § 240.21 (prohibiting disruption or disturbance of religious service, funeral, burial or memorial service); *id*. §§ 240.70–71 (prohibiting interference with health services or religious worship); 18 U.S.C. § 248(a)(2) (prohibiting injury to, intimidation of, or interference with people seeking to exercise their religious freedom at a place of worship). Legislators did not show—via testimony, enforcement history, or other evidence—how and why those laws were insufficient to protect people entering and exiting places of worship. *See supra* at 2–4. While the government undoubtedly has a significant interest in ensuring safe access to places of worship, the Nassau Buffer Law does not advance those interests in a narrowly tailored way that is responsive to demonstrated and credible public safety threats. Instead, the law impermissibly "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799.

ii. The Nassau Buffer Law Fails to Provide Ample Alternative Channels for Communication.

The Nassau Buffer Law also independently violates the First Amendment because it forecloses all avenues for direct, peaceful engagement with worshippers, such as leafleting or direct conversations, and speech responsive to events occurring inside places of worship. "Whether a restriction leaves untouched ample alternatives for communication is not a formulaic inquiry, but depends on the nature of the forum sought, the nature of alternative fora, and the impact of the regulation on the ability of the regulated person or persons to get their message out." *Beal v. Stern*, 184 F.3d 117, 130 (2d Cir. 1999). "The requirement that potential alternatives be 'ample' requires a nuanced analysis that may take account of (1) the audience to which the speaker seeks to

17

communicate and (2) the contribution of the desired location to the meaning of the speech." *Million Youth Mar., Inc. v. Safir*, 18 F.Supp. 2d 334, 347 (S.D.N.Y. 1998) (citations omitted). In traditional public fora, "the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). And when a "challenged regulation seems likely to obliterate the plaintiff's message, the existence of less restrictive alternatives that would protect the valid regulatory interest is material to the constitutional issue." *Ayres v. City of Chicago*, 125 F.3d 1010, 1016 (7th Cir. 1997).

Plaintiffs, based in part on their own Catholic faith, seek to pass out copies of the Bishops' Statement to churchgoers as they enter and exit churches across Nassau County and to engage worshippers in a conversation about their faith and immigration. *See* Borecky Decl. ¶¶ 3, 8, 17–34, 42–43; Thiery Decl. ¶¶ 6–7, 16–22, 24–25. Ms. Thiery similarly wishes to distribute leaflets on legal rights to worshippers as they enter and leave churches. Thiery Decl. ¶ 33. Yet the Nassau Buffer Law bars Plaintiffs from engaging in this speech concerning their own faith, as well as social and political issues, and provides no adequate alternative avenues for them to speak their message to the relevant audience—worshippers attending Mass. *See* Borecky Decl. ¶¶ 30, 37–40; Thiery Decl. ¶¶ 21, 24; *McCullen*, 573 U.S. at 488–90 (explaining a buffer zone law "ma[king] it substantially more difficult for [individuals] to distribute literature to arriving patients" imposes "an especially significant First Amendment burden"). And by prohibiting such one-on-one expressive activity, the law necessarily precludes Plaintiffs from speaking their message using written literature, by distributing physical items, or in personal conversations. *McCullen*, 573 U.S. at 489–90 (explaining that a buffer zone law has "effectively stifled [the] petitioners' message" because the availability of various forms of protest outside the buffer zone is not an adequate avenue to effectively communicate a message "through personal, caring, consensual

18

conversations").

The law therefore fails to provide ample alternative channels for Plaintiffs' speech. *See Million Youth Mar., Inc.*, 18 F. Supp. 2d at 348 (granting preliminary injunction permitting a rally to take place in location desired by organizers because alternative location "would adversely affect plaintiff's ability to reach its target audience" and alter the meaning of the rally's message); *Ayres*, 125 F.3d at 1016–1017 (upholding preliminary injunction enjoining enforcement of law barring selling of T-shirts with political message in most of a city's downtown areas during a festival in a park because, *inter alia*, the ban prohibits "the vehicle of [the plaintiff's] ideas and opinions" and is not so circumscribed that the plaintiff could "peddle their T-shirts to people entering and leaving the park").

Similarly, the Nassau Buffer Law prohibits speakers who wish to speak in dialogue with, in support of, or in opposition to events being held inside places of worship and to reach audience members attending such events. Since the law applies before, during, and after events inside places of worship, Local Law 6-2025 § 4, individuals cannot meaningfully communicate their message to event attendees, to speakers inside, or to places of worship as a whole. For example, were an elected official to give a speech at a place of worship on an issue of public concern, the law prohibits people from leafleting attendees about their disagreement with the official's viewpoint; from displaying signs seeking support for a particular policy proposal within direct view of the elected official or attendees as they enter and leave; and from protesting in an orderly and non-obstructive fashion outside the building's entrances and driveways to express dissatisfaction with the place of worship platforming that elected official. Since the law's restrictions on expressive activity are tied to the driveways and entrance areas that often abut a public road or sidewalk, *see supra* at 5–6, 9, it burdens such speech directed to individuals going to and from a place of worship,

19

whether in a vehicle or on foot.[3] The law thus impermissibly deprives individuals in Nassau County of ample alternative channels for communication by making it impossible to reach specific audiences and to speak particular messages. *See City of Ladue v. Gilleo*, 512 U.S. 43, 56, 57–58 (1994) (holding ordinance barring the display of almost all residential signs violated the First Amendment because, *inter alia*, residents display such signs "to reach *neighbors*, an audience that could not be reached nearly as well by other means" and "[d]isplaying a sign from one's own residence often carries a message quite distinct from" other means of communication).

Therefore, even assuming the Nassau Buffer Law is a content-neutral regulation on speech, it violates the First Amendment because it is neither narrowly tailored nor provides ample alternative avenues of communication.

### b.   *The Nassau Buffer Law Is Void for Vagueness and Violates Due Process.*

Plaintiffs are also likely to succeed on their claims that the Nassau Buffer Law violates the Fourteenth Amendment and the New York Constitution's due process guarantee. *See People v. Isaacson*, 44 N.Y.2d 511, 519 (1978) (explaining that "under . . . N.Y. State Const. art. I, § 6, this court may impose higher standards than those held to be necessary by the Supreme Court under the corresponding Federal constitutional provision"). A statute can be "impermissibly vague" if it "authorize[s] or even encourage[s] arbitrary and discriminatory enforcement." *Chicago v.*

---

[3] Engaging in such speech outside the buffer zones that emanate from a place of worship's entrances and driveways would be ineffective because the targeted audience would be unable to adequately receive leaflets, read signs, or understand a protest's message from approximately 35 feet away or more. For example, when a person who wishes to leaflet and engage in one-on-one oral advocacy is pushed "well back from" a place of worship's "entrances and driveways," the distance created by the buffer zone "compromise[s] [their] ability to initiate the close, personal conversations that they view as essential," and "deprive[s] [them] of their . . . primary methods of communicating with" their audience—attendees. *McCullen*, 573 U.S. at 487. Further, while the protest could possibly occur more than one hour before or after the event, the change in timing alters the message—that the protest is against a *particular* event—and its effective reach.

*Morales*, 527 U.S. 41, 56–57 (1999). To avoid arbitrary and discriminatory enforcement, a law must "provide explicit standards for those who apply them" and avoid "impermissibly delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972). Vagueness is especially intolerable "where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,'" because "it 'operates to inhibit the exercise of (those) freedoms.'" *Id*. at 109 (citations omitted). Accordingly, "[i]f . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 492 (1982).

The Nassau Buffer Law is vague on its face because criminal liability for the proscribed expressive activities attaches after an individual "receive[s] a verbal, written, or other communicative or expressive instruction, warning, or order" from a police officer. Local Law 6-2025 § 4. The law impermissibly delegates to law enforcement "unbridled discretion" that "would allow an official to pick and choose among expressions of view the ones [they] will permit to use the streets and other public facilities." *Cox v. State of La.*, 379 U.S. 559, 569 (1965). Specifically, the statute does not prescribe when or in what circumstances an "instruction, warning, or order" should be given, meaning officers may pick and choose when to criminalize certain speech. The law thus permits what the Supreme Court held was explicitly forbidden in *Cox v. State of La.*, 379 U.S. 536 (1965). There, the Court held a city could not constitutionally exempt certain meetings and parades that obstruct traffic from a general prohibition on such activities when, *inter alia*, the "statute itself provides no standards" for how such exemptions are made. *Id*. at 555–57. Likewise, here, the Nassau Buffer Law—a statute regulating speech—permits enforcement based entirely on "[the authorities'] completely uncontrolled discretion" and thus is "a device for the suppression of

21

the communication of ideas and permits the official to act as a censor." *Id*. at 557. *Cf. Morales*, 527 U.S. at 62 (when an "ordinance does not permit an arrest until after a dispersal order has been disobeyed," the law "does not provide any guidance to the officer deciding whether such an order should issue"). Further, the law gives an officer wide discretion to determine the type of "instruction, warning, or order" to give and provides no guidance on what the substance of the "instruction, warning, or order" should be.

Therefore, the law gives officers wide discretion to treat speakers and expressive activity differently—to criminalize speech based on the content or viewpoint of the speech. For example, officers could choose to provide clearer instructions to one group (*e.g.* giving an order over a megaphone) and give harder-to-understand instructions to another (*e.g.* such as waiving their arms or other bodily instructions) on the basis of viewpoint. Similarly, an officer may choose to facilitate one protest's compliance with the law's distance requirements (*e.g.* giving clear instructions on where the protest should be relocated) if they agree with the message expressed but order the protest's dispersal if they find the message offensive or distasteful. Further, law enforcement may choose to give no instructions, warnings, or orders to demonstrators at all because the police agree with the speech. In sum, the statute permits police to engage in selective enforcement—both in terms of the manner of enforcement and whether to enforce at all—against speech based on their agreement or disagreement with the speech's message. *See Smith v. Goguen*, 415 U.S. 566, 575–76 (1974) ("Where inherently vague statutory language permits such selective [viewpoint-based] law enforcement, there is a denial of due process.").

Especially because the Nassau Buffer Law restricts speech on public issues, which "occupies the highest rung of the hierarchy of First Amendment values," *Connick v. Myers*, 461 U.S. 138, 145 (1983) (cleaned up), it is "clearly unconstitutional," *Cox*, 379 U.S. at 557–58 (1965)

22

("It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute."); *see also Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 731 (7th Cir. 2025) (upholding preliminary injunction against floating buffer law that permits "any on-duty officer [to] use the buffer law to subject any pedestrian to potential criminal liability" on the officer's whim).

## II.    Absent Preliminary Relief, Plaintiffs Will Continue to Experience Irreparable Harm.

"The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (cleaned up). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (citation omitted); *see also New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). For that reason, when plaintiffs have alleged a colorable First Amendment claim, irreparable injury is generally met. *See Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary.") (citation omitted).

Plaintiffs have been chilled in their speech due to the Buffer Law and continue to be chilled while the law remains in effect. Plaintiffs, along with other individuals, had planned to leaflet and engage in oral advocacy outside of churches in Nassau County before and after Mass. Borecky Decl. ¶¶ 17–33; Thiery Decl. ¶¶ 16–22. But they cancelled their planned expressive activities out

23

of fear that the Nassau Buffer Law was in effect and continue to delay their speech out of fear of arrest, criminal prosecution, and criminal sanctions. Borecky Decl. ¶¶ 34–36; Thiery Decl. ¶¶ 23–25. These injuries will continue absent preliminary relief. And the harm grows with each passing day, as the Bishops' Statement was issued in November 2025, and Plaintiffs' message to parishioners may be altered as time continues to pass. Gyori Decl. Ex. 3.

III.    **The Balance of Equities and the Public Interest Strongly Favor Preliminary Relief.**

Both the balance of equities and the public interest weigh strongly in favor of preliminary injunctive relief. "In assessing these factors, [a] court must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), *aff'd as modified sub nom. New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020). The public interest is "particularly strong where [as here] the rights to be vindicated are constitutional in nature." *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 589 (N.D.N.Y. 2017).

The balance of equities tips sharply in Plaintiffs' favor because, absent injunctive relief, the Nassau Buffer Law will continue to chill speech, including Plaintiffs' speech, and subject individuals exercising their First Amendment rights outside of places of worship to the threat of arrest, prosecution, and criminal sanctions. *See* Borecky Decl. ¶¶ 2, 46; Thiery Decl. ¶¶ 2, 38; *Deide v. Day*, 676 F. Supp. 3d 196, 232–33 (S.D.N.Y. 2023) ("[W]here a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government.") (citation and quotation marks omitted). While the government cannot assert

24

a valid interest in violating the Constitution, "securing First Amendment rights is in the public interest." *New York Progress*, 733 F.3d at 488; *see P.G. v. Jefferson Cty.*, No. 21-CV-388, 2021 WL 4059409, at *5 (N.D.N.Y. Sept. 7, 2021) ("[T]he public interest lies with enforcing the Constitution and federal law.").

**IV.    The Court Should Enjoin Enforcement Against All Speakers.**

The proper scope of preliminary relief to ensure that Plaintiffs do not continue to be irreparably harmed by the Nassau Buffer Law is enjoining enforcement of the law against anyone. "[C]ourts generally 'may administer complete relief *between the parties*.'" *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). The key question "is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* at 852. "[A] corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends" is "implicit in the right to engage in activities protected by the First Amendment." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Accordingly, injunctive relief in First Amendment facial challenges to statutes necessarily requires that the unconstitutional law not be enforced against anyone. *See Reps. Comm.*, 147 F.4th at 733–34 ("To the extent the plaintiff media organizations rely on information and observations from ordinary citizens going about their day as source material for stories, enjoining the buffer law's enforcement statewide may be necessary to provide the *plaintiffs themselves* with complete relief."); *Doe v. Burlew*, 165 F.4th 525, 530 (6th Cir. 2026) (holding "if plaintiffs establish a law's unconstitutionality in the required number of applications, courts may grant injunctions that prohibit the government from enforcing the law against the plaintiff *in any circumstance*—not just as applied to *specific conduct*."). This is because the plaintiffs in such suits must associate with others to engage in expressive activities. *Reps. Comm.*, 147 F.4th at 733–34.

25

Here, Plaintiffs had planned to, and still seek to, engage in leafleting and oral advocacy with other community members outside nine churches in Nassau County. Borecky Decl. ¶¶ 2, 29, 32, 41–42, 45; Thiery Decl. ¶¶ 11, 20–22, 25, 39. Ms. Thiery also wishes to distribute leaflets with others outside storefront churches in the County. Thiery Decl. ¶ 33. If a preliminary injunction only enjoins enforcement of the Nassau Buffer Law against Plaintiffs, those non-parties who wish to join in these group actions with Plaintiffs would still face arrest, criminal prosecution, and sanctions under the law and could still be chilled in their speech. Borecky Decl. ¶ 44; Thiery Decl. ¶ 35. Such would undoubtedly violate Plaintiffs' right to expressive association. *See McSweeney v. Cohen*, 776 F. Supp. 3d 200, 241 (S.D.N.Y. 2025) ("[T]he First Amendment protects the right of expressive association."). Further, the number of participants in the group actions determines the audience that Plaintiffs can reach with their expressive activity and shapes their underlying messages. For example, if only Plaintiffs may participate in the distribution of the Bishops' Statement outside churches, they will be precluded from conducting the protest outside nine churches on the same day or close in time, and likely only be able to reach some parishioners attending mass at one or two churches in one day. *See* Borecky Decl. ¶¶ 29, 32; Thiery Decl. ¶ 22. This may in turn change the messages they wish to convey, including that many people in Nassau County wish to promote the Bishops' Message and see a relationship between immigrants' rights and the Catholic religion. Thiery Decl. ¶ 22.

Additionally, Plaintiffs do not intend to engage only in these specific actions in the future, but also to generally engage in expressive activity within 100 feet of places of worship during the pendency of this case. Borecky Decl. ¶¶ 41–43, 45; Thiery Decl. ¶¶ 34–39. Complete relief for Plaintiffs thus requires that they can expressively associate with anyone who may be interested in joining in these group actions with them. *See* Borecky Decl. ¶ 44; Thiery Decl. ¶¶ 35–36. That this

26

relief flows to non-parties is "merely incidental." *CASA*, 606 U.S. at 852 (citation omitted). Thus, for Plaintiffs to have complete relief during the pendency of this action, enjoining full enforcement of the Nassau Buffer Law is proper.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.

Dated: April 13, 2026
      New York, New York

Respectfully Submitted,

New York Civil Liberties Union
Foundation, by[4]:

Elizabeth Gyori
Jessica Perry
Molly K. Biklen
125 Broad St., 19th Fl.
New York, NY 10004
(212) 607-3300
egyori@nyclu.org

On the brief: Anya Weinstock*

*Admission to the EDNY forthcoming*

---

[4] The New York Civil Liberties Union recognizes and thanks law graduate Eman Naga for her contributions to the preparation of this brief.

27

## RULE 7.1(c) CERTIFICATION

The undersigned certifies that, using the "word count" feature of Microsoft Word and excluding the caption, table of contents, table of authorities, and signature blocks, the Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction dated April 13, 2026, contains 8,749 [less than 8,750] words.


Dated:  April 13, 2026
      New York, New York                                        Elizabeth Gyori